**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW HAMPSHIRE**


<u>Amherst Country Club, Inc.</u>

      v.                 Civil No. 07-cv-136-JL
                             Opinion No. 2008 DNH 120
<u>Harleysville Worcester</u>
<u>Insurance Co.</u>


## O R D E R

After the swimming pool on its premises was destroyed in the Mother's Day Flood of 2006, Amherst Country Club, Inc. petitioned the New Hampshire Superior Court for declaratory judgment that the Club's insurer, Harleysville Worcester Insurance Company, is obligated to cover the loss. <u>See</u> N.H. Rev. Stat. Ann. 491:22 (2001). Harleysville removed the action to this court pursuant to 28 U.S.C. §§ 1441 and 1446 (2006).

This court has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship).

The parties have filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56. Each party argues that there are no genuine issues as to any material facts, but advocates for entirely different legal conclusions. Amherst Country Club argues that it is entitled to coverage as a matter

of law, while Harleysville argues, also as a matter of law, that
the insurance policy in question excludes coverage for the loss.

After hearing oral argument on the cross-motions, and after
reviewing the parties' respective memoranda, objections,
affidavits, reply briefs, expert reports and depositions, the
court denies the Club's motion for summary judgment, grants
Harleysville's motion for summary judgment, and awards judgment
to Harleysville.

## I.   **APPLICABLE LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a motion for
summary judgment will be granted "if the pleadings, the discovery
and disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c) (2008) (amended December 1, 2007); <u>see</u> <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 322 (1986) (decided under prior,
substantially identical version of the rule); <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 247 (1986) (same).  "The object of
summary judgment is to pierce the boilerplate of the pleadings
and assay the parties' proof in order to determine whether trial
is actually required."  <u>Dávila v. Corporación de P.R. Para la
Difusión Pública</u>, 498 F.3d 9, 12 (1st Cir. 2007) (quotations

omitted) (quoting <u>Acosta v. Ames Dep't Stores, Inc.</u>, 386 F.3d 5, 7 (1st Cir. 2004)).

Both parties have moved for summary judgment.  "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  <u>Littlefield v. Acadia Ins. Co.</u>, 392 F.3d 1, 6 (1st Cir. 2004).  New Hampshire law, however, which the parties agree is controlling,[1] places the burden of proof on the insurer. "By statute, the burden is on the insurance carrier to prove a lack of coverage."  <u>Hudson v. Farm Family Mut. Ins. Co.</u>, 142 N.H. 144, 146 (1997) (citing N.H. Rev. Stat. Ann. 491:22-a);[2] <u>Union Mut.</u>, 835 F.Supp. at 63 ("[W]hen insurance coverage is disputed, New Hampshire law places the burden of proving that no coverage

_____

[1]  <u>See</u> <u>Moores v. Greenberg</u>, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987) (where parties agree as to what substantive law applies, a federal court sitting in diversity jurisdiction should comply); <u>see</u> <u>also</u> <u>Union Mut. Fire Ins. Co. v. Hatch</u>, 835 F.Supp. 59, 62 (D.N.H. 1993) (Devine, J.).

[2]  The applicable New Hampshire statute provides as follows:

> **491:22-a Liability Coverage; Burden of Proof.**  In any petition under RSA 491:22 to determine the coverage of a liability insurance policy, the burden of proof concerning the coverage shall be on the insurer whether he institutes the petition or whether the claimant asserting coverage institutes the petition.

N.H. Rev. Stat. Ann. 491:22-a (2001).

exists on the insurer.") (citing <u>Laconia Rod & Gun Club v. Hartford Acc. & Indem. Co.</u>, 123 N.H. 179, 182 (1983)).

"The interpretation of the language of an insurance policy, like any contract language, is ultimately an issue for the court to decide." <u>Merchants Mut. Ins. Co. v. Laighton Homes, LLC</u>, 153 N.H. 485, 487 (2006) (citing <u>D'Amour v. Amica Mut. Ins. Co.</u>, 153 N.H. 170, 171 (2005)); <u>Ekco Group, Inc. v. Travelers Indem. Co. of Ill.</u>, 273 F.3d 409, 412 (1st Cir. 2001).

## II.  **BACKGROUND**

During mid-May, 2006, much of southern New Hampshire experienced prolonged, heavy rains, which became known as the "Mother's Day Flood."  The parties and their respective experts agree that the rain and flooding caused increased groundwater levels, and that the water table in the pool area of the Amherst Country Club was unusually high.  <u>See</u> <u>infra</u> Part III(B)(1) and n.9.

On May 18 or May 19, 2006, a maintenance worker at the Amherst Swim Club, Inc. (the entity which operated the swimming pool located on the premises of the Amherst Country Club) drained the water from the pool for its spring cleaning, as had been done annually for approximately 30 years.  The soil surrounding the concrete swimming pool was saturated with groundwater, creating

4

hydrostatic pressure that, once enough water had been drained from the pool, "floated" the pool up and out of the ground.  This disturbance of the pool's physical position caused its structure to crack and break, destroying it.

The Club, which had purchased its building and personal property insurance coverage from Harleysville, notified its insurance agent of the loss and requested coverage.  The coverage provision of the policy's "Building and Personal Property Coverage Form" states:

> **A.    *Coverage***
>
> *We will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.*
>
> > *1.    Covered Property*
> >
> > > *a.    Building, meaning the building or structure described in the Declarations, including:*
> > >
> > > . . . .
> > >
> > > *(2) Fixtures, including outdoor fixtures.*

The policy also includes a list of exclusions, or losses not covered by the policy.  The pertinent "exclusions" provide:

> **B.    *EXCLUSIONS***
>
> > *1.    We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that*

5

> > *contributes concurrently or in any sequence*
> > *to the loss.*
> >
> >             *. . . .*
>
> b.   *Earth Movement*
>
> > (4)   *Earth sinking (other than sinkhole collapse),*
> >       *rising or shifting including soil conditions*
> >       *which cause settling, cracking or other*
> >       *disarrangement of foundations or other parts*
> >       *of realty.  Soil conditions include*
> >       *contraction, expansion, freezing, thawing,*
> >       *erosion, improperly compacted soil and the*
> >       *action of water under the ground surface.*
> >
> >             *. . . .*
>
> g.   *Water*
>
> > (4)   *Water under the ground surface pressing on,*
> >       *or flowing or seeping through:*
> >
> > > (a)   *Foundations, walls, floors or paved*
> > >       *surfaces;*
> > >
> > > (b)   *Basements, whether paved or not; or*
> > >
> > > (c)   *Doors, windows or other openings.*

Section B(1) of the exclusion provision set forth above is referred to by the parties as the "lead-in" provision, and is known in the industry as an "anti-concurrent causation" clause. The parties refer to sections B(1)(b) and B(1)(g) as the "earth movement exclusion" and the "water exclusion," respectively. Harleysville declined coverage based on the "water" exclusion. This declaratory judgment action followed.

III. **ANALYSIS**

The parties agree that, although the "coverage" section of the insurance policy makes no specific reference to swimming pools, it applies to the pool in question as a "fixture" or "outdoor fixture."  See supra Part II; Pleasant Valley Campground, Inc. v. Rood, 120 N.H. 86, 88 (1980).

Amherst Country Club argues that (1) neither the "earth movement" nor "water" exclusion applies because they are too ambiguous, (2) in any event, the cause of the damage to the pool was not groundwater pressure, but the draining of the pool by a pool attendant,[3] and (3) the lead-in anti-concurrent clause doctrine, if applicable, is unenforceable as a matter of public policy.  Harleysville differs on all three points, arguing that (1) the plain and unambiguous language of the "earth movement" and "groundwater" exclusions releases it from the obligation to cover the losses, (2) the cause of the loss was the sub-surface groundwater pressure around and under the pool, as opposed to its

---

[3]  At oral argument on the motion, the Club retreated from this position, emphasizing instead that groundwater pressure could not be the "efficient proximate cause."  See infra Part III (B)(1).  This shift, which did not undermine the Club's arguments or position in any way, was likely the result of the court's pointing out, and the Club conceding for the purposes of the motion, that neither draining the pool nor the groundwater pressure could have caused the loss alone, without the other, and that neither event could thus constitute the efficient proximate cause as a matter of law.  See id.

draining, and (3) regardless of whether the groundwater pressure was the dominant cause or a concurrent cause, the "anti-concurrent causation" lead in clause excludes coverage, and is enforceable under New Hampshire law.

### A.    **The terms of policy**

### 1.    **Applicable law**

The New Hampshire Supreme Court, and thus this court, "interprets an insurance policy in the same manner as any other contract." Hudson, 142 N.H. at 146 (citing Trombly v. Blue Cross/Blue Shield, 120 N.H. 764, 770 (1980)). "The fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties. To discern the parties' intent, we first examine the language of the contract itself." Bates v. Phenix Fire Ins. Co., ___ N.H. ___, 943 A.2d 750 (N.H. 2008) (quoting Tech-Built 153 v. Va. Surety Co., 153 N.H. 371, 373 (2006)). New Hampshire courts will "enforce a policy provision that limits the insurance company's liability when the policy language is clear and unambiguous." Merchants Mut., 153 N.H. at 487 (citing Deyette v. Liberty Mut. Ins. Co., 142 N.H. 560, 561 (1997)). As discussed more fully infra, however, ambiguities in the policy's statement of coverage

are construed in favor of the insured.  <u>See</u>, <u>e.g.</u>, <u>Hoepp v. State</u>
<u>Farm Ins. Co.</u>, 142 N.H. 189, 190 (1997).

The parties' dispute revolves in part around the meaning of
three words in the "water" exclusion--"walls," "floors," and
"paved surfaces," that are not defined in the policy.

> If a term is not defined in the policy, the term
> is to be given its plain and ordinary meaning,
> construed "as would a reasonable person in the
> position of the insured based on more than a
> casual reading of the policy as a whole."

<u>Sig Arms, Inc. v. Employers Ins. of Wausau</u>, 122 F.Supp.2d 255,
259 (D.N.H. 2000) (DiClerico, J.) (quoting <u>High Country Assocs.</u>
<u>v. N.H. Ins. Co.</u>, 139 N.H. 39, 41 (1994)).  This familiar
standard--requiring construction of the policy "as would a
reasonable person in the position of the insured based on more
than a casual reading of the policy as a whole"--is applied by
New Hampshire courts not only to purported ambiguities, but to
all "terms of the policy."  <u>Littlefield</u>, 392 F.3d at 7.  Only
"objectively reasonable expectations of the insured," however,
"can negate policy provisions that would negate those
expectations."  <u>Comm. Union Assur. Co. v. Aetna Cas. & Sur. Co.</u>,
455 F.Supp. 1190, 1193 (D.N.H. 1978).

2.    **The exclusions**

a.    **The water exclusion**

The "water" exclusion in the Harleysville policy excludes coverage for "[w]ater under the ground surface pressing on, or flowing or seeping through [f]oundations, walls, floors or paved surfaces."  The Club argues that the exclusion does not apply to swimming pools, and specifically that the lack of internal definitions for the terms "walls," "floors," and "paved surfaces," requires the exclusion to be construed against Harleysville.  A swimming pool, the argument goes, is not <u>in and of itself</u> a wall, floor, or paved surface.  And even if walls, floors, and paved surfaces could potentially be parts of swimming pools, an equally plausible reading is that those are parts of a building, as opposed to a fixture like a pool.  If this exclusion were meant to apply to groundwater damage to swimming pools, says the Club, the exclusion should make specific reference to swimming pools, as did the policies at issue in <u>Murray v. All American Ins. Co.</u>, 121 Ohio App. 3d 29 (1997), and <u>Bebber v. CNA Ins. Co.</u>, 729 N.Y.S.2d 844 (2001).

This argument is unpersuasive, because it relies on an overly expansive view of the concept of ambiguity in insurance contracts, suggesting that New Hampshire courts construe even the

10

most superficial ambiguities against insurers.  As the First
Circuit Court of Appeals noted in <u>Ekco Group</u>,

> New Hampshire, like most states, tends to favor
> the insured where the policy is <u>genuinely
> ambiguous</u> and the choices between two <u>plausible</u>
> readings, one providing coverage and the other
> not.  <u>But plausibility is a matter of degree, and
> the policy may be unclear in some respects and
> clear enough in others</u>.

273 F.3d 409, 412 (1st Cir. 2001) (emphases added) (internal
citation omitted).  "New Hampshire courts . . . will not find
that a clause is ambiguous simply to interpret the clause in
favor of the insured and against the insurer."  <u>LaSorsa v. Unum
Life Ins. Co. of Am.</u>, 955 F.Supp. 140, 147, (1st Cir. 1992)
(citing <u>Laconia Rod & Gun Club</u>, 123 N.H. at 182-83).  Neither the
fact that the parties "dispute the scope of a policy's coverage,"
<u>Titan Holdings Syndicate, Inc. v. City of Keene</u>, 898 F.2d 265,
269 (1st Cir. 1990), nor "that the parties may disagree on the
interpretation of a term of clause in an insurance policy,"
<u>Bates</u>, 943 A.2d at 753, renders the policy ambiguous.

     "The meaning of the language must be <u>unclear</u>, and the
parties' dispute based upon <u>reasonable</u> differences about the
language's interpretation."  <u>Titan Holdings</u>, 898 F.2d at 269
(emphases added).  The case law defining the concept of "genuine
ambiguity" in insurance policies makes reasonableness the
cornerstone of the inquiry.  <u>See</u>, <u>e.g.</u>, <u>LaSorsa</u>, 955 F.Supp at

11

147; <u>Curtis v. Guaranty Trust Life Ins. Co.</u>, 132 N.H. 337 (1989);

<u>Smith v. Liberty Mutual Ins. Co.</u>, 130 N.H. 117, 121 (1987)

(Souter, J.) (citing 3 A. Corbin, <u>Contracts</u> § 543A (Supp. 1971);

<u>Trombly</u>, 120 N.H. at 772; <u>Miller v. Amica Mut. Ins. Co.</u>, 156 N.H.

117, 120 (2007); <u>Trombley v. Liberty Mut. Ins. Co.</u>, 148 N.H. 748,

751 (2002).

Assessing the purported ambiguity under the standards

established by the applicable New Hampshire Superior Court

precedent, this court concludes that a reasonable person in the

position of the Amherst Country Club, undertaking a more than

casual reading of the policy as a whole, would understand that

the "water" exclusion unambiguously applies to swimming pools.

The fact that the terms "wall," "floor," and "paved surface" are

not defined in the policy does not require, or even suggest, a

different conclusion.  "[T]he draft of a policy need not define

each word in the policy <u>ad infinitum</u>, but may rely on the

ordinary meanings of words." <u>Titan Holdings</u>, 898 F.2d at 269

(citing <u>Robbins Auto Parts, Inc. v. Granite State Ins. Co.</u>, 121

N.H. 760, 764 (1981)).  It is difficult for the Club, as the

owner of a swimming pool, to argue convincingly that the words

"walls" and "floor" are not commonly used to refer to the sides

and bottom of a swimming pool.  Everyday words like "wall,"

"floor," and "paved surface," are particularly amenable to

12

construction according to their ordinary meanings rather than by technical definition.

Rather than reflexively declare these undefined words to be ambiguous and construe them against Harleysville, the court must "look to the claimed ambiguity, consider it in its appropriate context, and construe the words used according to their plain, ordinary, and popular definitions." Union Mut., 853 F.Supp. at 62 (quoting LaSorsa, 955 F.2d at 148). A "wall" is defined[4] as a "vertical architectural member used to define and divide space," Webster's Third New International Dictionary 2572 (2002) ("Webster's"), and as an "upright structure of masonry, wood, plaster or other building material serving to enclose, divide, or protect an area." The American Heritage Dictionary of the English Language 1936 (2000) ("American Heritage Dictionary"). Likewise, the common definition of "floor" is "the lower inside surface of any hollow structure." Webster's 873, and as the "lower or supporting surface of a structure." American Heritage Dictionary 674.

Further indications that the plain and ordinary meanings of the words "wall" and "floor" include the sides and bottom of a

---

[4] See Hudson, 142 N.H. at 147 (Broderick, J.) ("dictionaries are of some value [in interpreting insurance policies] to the extent they inform us of the common understanding of terms"); see also Littlefield, 392 F.3d at 8.

swimming pool are contained in the expert witness depositions taken in this case. There, experts and counsel alike--including counsel for the Club--made continuous, comfortable, off-handed references to the sides and bottom of the Amherst Country Club swimming pool as its "walls" and "floor."  (Reynolds Deposition Transcript at 40-41 (walls), 42 (wall, floor), 73 (floor); Cricenti Deposition Transcript at 23 (floor), 37 (wall), 43-45 (wall, floor)).  The Club's counsel sometimes objected to form when Harleysville's counsel included "wall" and "floor" in his questions, (Cricenti Deposition Transcript at 23 (floor), 43-45 (floor, wall)), but objections or lack thereof to this phraseology are not the point.  At no time during the deposition, did anyone present express the slightest bit of confusion over attorneys' or witnesses' use of the terms "wall" and "floor" in reference to the pool's sides and bottom.[5]

Even if one were to assume that the existence of walls and floors in structures other than swimming pools rendered these terms genuinely ambiguous in the context of the policy as a

_____

[5]  Amherst Country Club correctly points out that the ambiguity standard is not to be applied from the perspective of professional engineers but from that of laymen.  The attorneys conducting and taking the depositions, however, were in fact laymen in the structural engineering field, and required no definitional explanations for the pool's walls and floor, as were requested for terms like "high pressure valve" (Cricenti Deposition Transcript at 23) and "ballast" (id. at 24).

whole, the same cannot be said of the term "paved surfaces."
Although this term may more immediately evoke the notion of a
driveway or parking lot, there can be no question that the plain
and ordinary meaning of the term is broad enough to include the
Club's swimming pool.  The Club's expert testified at his
deposition that the pool and its floor were constructed of
"concrete" that was "cast in place," in other words, mixed and
applied directly to the surface of the excavated cavity in which
the pool sat, just like concrete paving on sidewalks, driveways,
and patios.  Indeed, "paved" is defined simply as "covered with a
pavement," Webster's 1658; see also American Heritage Dictionary
1291 ("pave"), with a specific reference to "concrete" as such a
material.  Webster's 1658; see also American Heritage Dictionary
1291.  To the extent that "surface" requires a definitional
explanation, it is "the exterior or outside of an object or body;
the outer most or upper most boundary."  Webster's 2300; see also
American Heritage Dictionary 1741.

     The Club strived mightily, both in its summary judgment
filings and at oral argument, to establish that a pool cannot be
or have a paved surface because paved surfaces are "paved" as
opposed to "poured," composed of asphalt as opposed to concrete,
and are designed solely for smoothness and flatness to facilitate
travel or movement.  Leaving aside the dictionary definitions

just cited, this argument runs counter to any common
understanding of the word "pavement."  Concrete streets,
driveways, and patios are no less paved surfaces because they are
comprised of concrete that is poured, as opposed to asphalt that
is laid or paved.  Were "paved surfaces" intended to be limited
to asphalt in the manner the Club suggests, one would have
expected the exclusion to specify "asphalt surfaces," rather than
use a more generic term.

Finally, use of the term "paved" elsewhere in the policy
reinforces this conclusion.  The subsection immediately following
the reference to "walls, floors, and paved surfaces," Section
B(1)(g)(4)(b), excludes groundwater damage to "[b]asements,
whether paved or not."  If a basement, which is almost always
poured concrete, is "paved" under the terms of the policy, the
same unambiguously can be said of a swimming pool.  See Sig Arms,
122 F.Supp. 2d at 259  (policy must be construed "as a whole")
(quoting High Country Assocs., 139 N.H. at 41).

The Club has cited no authority, binding or persuasive, for
the proposition that the terms "wall," "floor," and "paved
surface" are ambiguous as applied to a swimming pool in the
context of a property insurance policy exclusion.  Although the
parties cited several floating-swimming-pool cases, the only one
considering whether these words are ambiguous is AGK Holdings,

16

<u>Inc. v. Essex Insurance Co.</u>, 142 Fed. Appx. 889 (6th Cir. 2005).
In that case, which applies an identical "water" exclusion to
substantively identical facts, the insured argued "that the
groundwater exclusion does not apply to swimming pools," <u>id.</u> at
891, relying on precisely the same arguments that the Club
advances here:  that the terms "floor" and "paved surface" are
susceptible to more than one interpretation.  Utilizing
dictionary definitions, however, the Sixth Circuit Court of
Appeals found no ambiguity in those terms, and ruled that they
commonly could be understood to refer to parts of a swimming
pool.  <u>Id.</u> at 892-93.  Like the Club here, the plaintiff in <u>AGK
Holdings</u> further argued that the absence of a reference to
"swimming pools" in the exclusion, under circumstances where
specific references to pools were made in other sections of the
policy, indicated that the groundwater exclusion did not apply.
The Sixth Circuit disagreed, finding that "such an argument
ignores the clear and unambiguous language of the contract terms.
Since a 'floor' or 'paved surface' can be applied respectively to
the bottom or interior surface of the swimming pool, inclusion of
more specific language is not required."  <u>Id.</u> at 893.[6]

_____

        [6]  The Club argues that <u>AGK Holdings</u> is inapposite for
several reasons, two of which merit discussion.  It first argues
that the <u>AGK Holdings</u> Court based its decision "on the principle"
that a policy term with several definitions must be construed in

17

So while it is true that a specific reference to "swimming pools" in the water exclusion would have eliminated all debate in this case, its absence creates no ambiguity.  "While a claimed ambiguity need not be apparent on the face of the policy, [this court] will not perform amazing feats of linguistic gymnastics to find a purported ambiguity."  Hudson, 142 N.H. at 147; see also Fed. Bake Shop v. Farmington Cas. Co., 144 N.H. 40, 42 (1999).

---

favor of the insurance company, as opposed to the policyholder. The AGK Holdings court neither referred to nor followed any such principle.  Id. at 892-93.  In fact, because it found no ambiguity, it had no occasion to resolve it in either party's favor.

The Club further distinguishes AGK Holdings because the court there, "[c]ontrary to the approach . . . under New Hampshire law . . . allowed for examination of extrinsic evidence to" resolve ambiguity, and would only construe ambiguous language against the insurer as a last resort.  Although extrinsic evidence (save dictionary definitions, specifically endorsed as useful in Hudson, 142 N.H. at 147 (Broderick, J.)) played no role in this court's construction of the Harleysville policy, it bears noting that New Hampshire law is no different.  First, there is the familiar rule that permits New Hampshire courts to consider the "context" of the claimed ambiguity, as well as the "plain, ordinary, and popular definitions" of the words or terms in question.  Union Mutual, 835 F.Supp. at 62.  Second, and more to the point, the rule strictly construing ambiguities -- even genuine ambiguities -- against the insured is "a rule of presumption only."  Town of Epping v. St. Paul First and Marine Ins. Co., 122 N.H. 248, 252 (1982).  The court may consider extrinsic evidence to rebut the presumption by resolving such ambiguities, id. at 252-53, to ensure that "the ambiguity rule not be applied to create coverage where it is clear that none is intended."  Id. at 252 (quoting Robbins Auto Parts, 121 N.H. at 762); see also Smith, 130 N.H. at 121 (Souter, J.)).

The focus is on the ordinary meaning of the policy language, which cannot possibly provide specifically for every conceivable circumstance.  Were it otherwise, routine policies might exceed hundreds or thousands of pages in length, rendering the "more than casual reading by the insured" standard a complete fiction with no relationship to the likely conduct of actual policyholders.  The "water exception" is unambiguous, applies to the pool, and excludes coverage for the loss in question.

      **b.**   **The "earth movement" exclusion**

Though the "water" exclusion unambiguously excludes the loss at issue here from the coverage of the policy, Harleysville argues that the "earth movement" exclusion unambiguously excludes the Club's loss as well.  The court agrees.  The provision, Section B(1)(b)(4), excludes coverage for "[e]arth sinking . . . rising, or shifting, including soil conditions which cause . . . disarrangement of foundations or other parts of realty."  The exclusion defines "soil conditions" to include "the action of water under the ground surface."

This provision does not suffer from any of the purported ambiguity-causing shortcomings the Club has identified in the "water" exclusion.  It expressly identifies the scope of the exclusion with respect to the property:  "foundations or other

parts of realty."  The Club conceded at oral argument that, as a

fixture, the swimming pool was part of its "realty."[7]  The

exclusion describes precisely the type of damage sustained by the

pool:  "cracking or other disarrangement."  And the definition of

"soil conditions" specifically include "the action of water under

the ground surface."

Oral argument included an interesting discussion about

whether this definition properly treats groundwater as "part of"

the earth's soil, subject to "movement" within the meaning of the

exclusion, or whether groundwater just "flows through" the earth

without causing it to move.  Regardless of the answer to that

question in the geological sense, the exclusion applies here

because it expressly defines groundwater action as one example of

"soil conditions which cause . . . cracking or disarrangement of

. . . parts of realty."  This detailed definition eliminates any

ambiguity as to the scope of "earth movement."  Cf. Fed. Bake

Shop, 144 N.H. at 43 (construing policy term found to be

---

[7]  In addition, though not discussed extensively at the
hearing or in the parties' respective filings, and not necessary
for this court's ruling, the reinforced concrete pool, almost all
of which sat beneath the surface of the ground, is also a
"foundation."  See, e.g., Cricenti Deposition Transcript at 11
(". . . the concrete that we see for the bottom and the sides is
the foundation of the pool.")  This observation is also relevant
to the "water" exclusion, which expressly applies to
"foundations."

ambiguous against insurer which "could have defined" the
ambiguous term, but "chose not to do so").

The parties agree that groundwater pressure was at least a
concurrent cause of the pool's floating out of the ground and
eventual destruction.  A reasonable insured undertaking more than
a casual reading of the earth movement exclusion would have no
difficulty discerning that (1) "the action of water under the
ground surface" was (2) a "soil condition" that (3) "cause[d] . .
. cracking or other disarrangement of part[] of realty," thus
meeting one of the policy's definitions on earth movement.

It makes no difference that, as the Club points out, both
experts disavowed "earth movement" as the cause of the loss; that
testimony was elicited by questions involving was "earth
movement" in the generic sense, not as specifically defined in
the exclusion.  The cases cited by the Club in its summary
judgment papers are unhelpful for similar reasons.[8]  None of them
construes "earth movement" exclusions which make any express
reference to groundwater movement, much less include, as the

_____

[8] See Nautilus Ins. Co. v. Vuck Builders, 406 F.Supp. 2d
899, 903 (N.D. Ill. 2005); Murray v. State Farm Fire & Cas. Co.,
509 S.E.2d 1, 17-20 (W. Va. 1998); M&M Holdings, Inc. v. State
Auto Prop. & Cas. Ins. Co., No. 06-4031-SAC, 2007 WL 1531843, at
*3 (D. Kan. 2007).

Harleysville policy does, it as a specific type of earth movement within the meaning of such an exclusion.

Finally, at oral argument, the Club argued that the "earth movement" exclusion is ambiguous because, even though groundwater movement itself was specified as a type of cause under the exclusion, an ambiguity nonetheless results from the exclusion's title, "Earth Movement," a heading in the insurance contract. Referencing groundwater movement under an exclusion titled "earth movement" is inherently ambiguous, the argument goes, because a reasonable insured might not think of water as part of the soil, and thus would not consider groundwater movement to constitute earth movement.  This argument, however, is inconsistent with New Hampshire's "reasonable insured undertaking a more than casual reading of the policy as a whole" standard.  Whatever general impression the title of the exclusion might cause, the language of the provision itself specifies "the action of water under the ground surface" as an excluded cause.  See Cross Petroleum v. United States, 51 Fed. Cl. 549, 555 (Ct. Cl. 2002) (reasoning that title of contractual provision "does not invite the court to ignore the plain meaning of the provision's language"); accord N.H. Ins. Guar. Ass'n v. Pitco Frialator, Inc., 142 N.H. 573, 580 (1998) (ruling that language of statutory provision trumped its

title).  The "earth movement" exclusion is unambiguous, applies

to the pool, and excludes coverage for the loss in question.


**B.   Causation**

**1.    Applicable law -- efficient proximate cause**

The parties agree that increased groundwater levels during

and after the 2006 Mother's Day Flood caused the pool to "float"

upward as its weight (or ballast) was decreased when a pool

attendant pumped out the pool for its annual cleaning.[9]  They

_____

[9] In his expert report for the Amherst Country Club,
Professional Engineer Nicholas Cricenti, Jr., stated:

> Cause of the Failure
>
> When the pool is full of water and the groundwater
> is high the water inside acts as a ballast to keep
> the pool vessel from floating on the groundwater.
> This is evidenced by the fact that the pool did
> not float at any time during the previous week
> when the groundwater was at least as high and
> maybe even higher around the pool.  There was
> standing water on the deck earlier in the week.
>
> As the water inside the pool is pumped out,
> the ballast is removed and the pool is pushed
> upward by the pressure of the groundwater
> under the pool trying to equilibrate with the
> elevation of the groundwater.  At one point
> during the pumping process the forces pushing
> up overcame the weight of the ballast
> remaining in the pool and the pool floated.

Likewise, the report of the Harleysville's expert Professional
Engineer, Peter Reynolds, stated:

disagree, however, on whether the emptying of the pool or the groundwater beneath it was the cause of its destruction within the meaning of the exclusions.

As Professor Couch has observed,

> [t]he concept of "proximate cause" has a different meaning and applications in the area of insurance law than it has in tort law. <u>Tort law applies the rules of proximate cause for the purpose of fixing culpability for the damage being claimed in the lawsuit</u>. . . .   In contrast, the doctrine of proximate cause as applied to insurance law bears no relationship with the determination of "culpability" or the explanation for why the injury took place.   Instead, <u>insurance law employs the concept of proximate cause for purposes of determining whether the specific type of injury caused by the specific type of physical act or event was intended to be covered under the terms of the subject policy</u>.

---

> Cause of incident:  As the water in the pool was pumped out, the upward pressure of the groundwater eventually became more than the weight of the pool and contained water causing the deep end of the pool to float upward.

Both experts provided deposition testimony consistent with these conclusions (<u>Cricenti Deposition Transcript</u> at 46-50; <u>Reynolds Deposition Transcript</u> at 73).

7 Couch on Insurance § 101:40 (Steven Plitt, et al., eds.,

2008).[10]  Professor Stempel refers to this distinction as being

between "tort causation" and "contract causation."  1 Stempel,

§ 7.01, 1-10.

    The Club argues –- and Harleysville does not seriously

dispute -- that New Hampshire has adopted the "efficient

proximate cause" doctrine, as opposed to the more permissive

"concurrent cause doctrine,"[11] as the standard for determining

so-called "contract causation" under an insurance policy.

"Efficient proximate causation is the majority rule today."

4 Leitner, § 52.33.

> The efficient proximate cause doctrine has been
> applied under those circumstances in which two or
> more identifiable causes, at least one of which is

---

[10] Professor Couch's view is widely held.  "As one
commentator observed, with some degree of understatement,
[c]ausation has always been a troubling concept for lawyers."  1
J. Stempel; Stempel on Insurance on Insurance Contracts § 7.01
(Supp. 2008) (quoting B. McDowell, Causation in Contracts and
Insurance, 20 Conn. L. Rev. 569 (1988)).  "In all Anglo-American
law, there is no concept that has been so pervasive – and yet so
elusive – as the causation requirement . . . ."  P. Swisher,
Insurance Causation Issues:  the Legacy of Bird v. St. Paul Fire
& Marine Ins. Co., 2 Nev. L.J. 351 (2002).

[11] The minority concurrent cause rule "looks to whether one
of the causes of a loss is covered.  If so, the loss itself is
covered notwithstanding the fact that there is also an excluded
cause in the chain of causation."  4 D. Leitner, et al., Law and
Practice of Insurance Coverage Litigation, § 52:33 (2008).

> covered under the policy and at least one of which
> is excluded thereunder, contribute to a single
> loss.  If the cause which is determined to have
> set the chain of events in motion, the efficient
> proximate cause, is covered under the terms of the
> policy, the loss will likewise be covered.

7 Couch, § 101:45.  The New Hampshire Supreme Court applied the

efficient proximate cause doctrine,[12] albeit not by name, in

Terrien v. Pawtucket Mut. Fire Ins. Co., 96 N.H. 182, 185 (1950),

where the latter and more direct of two contributing causes was

held to be the proximate cause of the injury for purposes of

determining coverage under an insurance policy.

See also Nassif Realty Corp. v. National Fire Ins. Co. of

Hartford, 109 N.H. 117, 119 (1968) (citing Terrien and using the

phrase "the dominant and the efficient cause" to describe

proximate cause in the context of insurance coverage);

N.H. Ins. Co. v. Schofield, 119 N.H. 692, 695-96 (1979) (citing

Nassif).

---

[12] Scholarly and professional authority on the subject
appears to concur with the parties that New Hampshire has adopted
the efficient proximate cause doctrine, see D. Wuerfel & M. Koop,
"Efficient Proximate Causation" in the Context of Property
Insurance Claims, 65 Def. Couns. J. 400, 405 (1998) (citing
Terrien and listing New Hampshire among states applying efficient
proximate causation rule); 4 Leitner, supra, § 52:36 (same, also
citing Terrien); 2 B. Ostrager, T. Newman, Handbook on Insurance
Coverage Disputes § 21.02[c] at 1457 (2008).

The Club argues that the efficient proximate cause of the loss was the draining of the pool, bringing its destruction under the coverage of the policy nonwithstanding the exclusions.  But

> [e]fficient proximate cause <u>does not apply</u> in a case in which <u>there is more than one cause of loss and none of the causes is sufficient by itself to cause the loss</u>.  Efficient proximate cause applies only where there are several causes of loss in a chain of causation <u>and each cause could independently cause the loss</u>.

4 D. Leitner et al., § 52:33 (emphases added).  <u>See</u> <u>also</u> 7 Couch, § 101:45 ("Under any circumstances, in order for the efficient proximate cause doctrine to apply, there must be at least two potential causes of the subject loss."); <u>In re: Katrina Canal Breaches Litig.</u>, 495 F.3d 191, 223 (5th Cir. 2007); <u>Capitol Indemnity Corp. v. Evolution, Inc.</u>, 293 F. Supp. 1067, 1072 (D.N.D. 2003); <u>Crete-Montee Sch. Dist. v. Ind. Ins. Co.</u>, 2000 WL 1222155 (N.D. Ill. 2000); <u>Pieper v. Comm. Underwriters Ins. Co.</u>, 59 Cal. App, 4th 1008, 1020 (Cal. Ct. App. 1997); <u>see</u> <u>also</u> <u>Mattis v. State Farm Fire & Cas. Corp.</u>, 454 N.E.2d 1156, 1164 (Ill. Ct. App. 1983).  This case does not satisfy those criteria.[13]  The parties agree that the groundwater pressure would not have floated the pool out of the ground had the pool not been emptied, and neither argues that emptying the pool in the absence of the

---

[13] The Club conceded as much at oral argument.

elevated water table could have itself caused the pool to float.[14]

Thus, neither the draining of the pool--a covered cause--nor the pressure of the groundwater--an excluded cause--was the efficient proximate cause of the loss. Because, as just discussed, New Hampshire law requires the excluded cause to be the efficient proximate cause of the loss to trigger such an exclusion, see, e.g., 7 Couch, supra, § 101:45, it follows that the exclusions would not apply here. But the problem with this line of argument, as Harleysville points out, is that the policy

---

[14]   The court again notes the Club has unequivocally asserted (see supra Part III and n. 3) that the groundwater had no impact whatsever on the chain of causation. Even if the Club had not softened that position at oral argument, (see id.) it would have no bearing on this court's analysis. The entire record, including the Club's expert's opinion, and the fact that the pool had been drained annually for approximately 30 years without incident make this argument untenable, even in a summary judgment posture where Harleysville carries a statutorily imposed burden of proof and all inferences are drawn in the Club's favor.

The Club's argument that this court should follow Bebber v. CNA Ins. Co., 729 N.Y.S.2d 844 (N.Y. Supr. Ct. 2001), ruling that emptying the pool was the cause, is rejected. Bebber is both legally and factually inapposite. The New York Supreme Court in Bebber did not apply efficient proximate cause analysis as a New Hampshire court would, but rather applied a "but for" causation test, more akin to concurrent causation analysis. 729 N.Y.S.2d at 846. Further, in that case, the court took pains to note that there was no evidence of increased hydrostatic groundwater pressure, id., making the case dispositively distinguishable from this one.

itself eschews the concept of efficient proximate cause in its anti-concurrent clause provision.

## C.    **The anti-concurrent causation clause**

The final point of contention between the parties is the enforceability of the policy's lead-in "anti-concurrent causation" clause.[15]  If the clause -- which excludes coverage for any loss caused "directly" or "indirectly" by any of the specified causes, "regardless of any such cause or event that contributes concurrently or in any sequence to the loss" -- is enforceable, it resolves the dispute over causation without resort to the esoteric concepts just discussed.  Harleysville argues that the parties to an insurance contract are "free to contract around the efficient proximate cause doctrine," that many state and federal jurisdictions have enforced anti-concurrent causation clauses, and that the Club cites no authority suggesting  that New Hampshire refuses, or would refuse, to enforce anti-concurrent causation provisions.

For its part, the Club argues that anti-concurrent causation clauses "represent[] the latest effort of insurance carriers to avoid the effect of the efficient proximate cause test which New

---

[15]   The anti-concurrent causation clause is set forth in this entirety <u>supra</u> Part I.

Hampshire has adopted," that New Hampshire "has not and would not allow the enforcement of an anti-concurrent causation clause," and that Harleysville, which carries the burden of proof in this case, has not sustained his burden of proving otherwise.

Both parties' arguments rely on the same flawed assumption: that the New Hampshire Supreme Court has yet to enforce an anti-concurrent causation clause.  This shared misapprehension is understandable, however, in that the New Hampshire high court's enforcement of such a clause occurred only recently, and with little fanfare in the text of the opinion itself, or from insurance commentators or practitioners.  Further, at least one scholarly authority counts New Hampshire among a "number of states which have adopted the efficient proximate cause doctrine [but] have not had occasion to consider the enforceability of anti-concurrent causation policy language."  4 Leitner, § 52:36 & n.14 (listing New Hampshire as such a state, citing <u>Terrien</u>).

In <u>Bates v. Phenix Mutual Fire Insurance Co.</u>, decided in 2008, the New Hampshire Supreme Court enforced an anti-concurrent causation clause over the express objection of the insured.  943 A.2d at 753-54.  In <u>Bates</u>, heavy rains in southwest New Hampshire overwhelmed a culvert, causing the area immediately uphill to fill with an extraordinary volume of water.  <u>Id.</u> at 751.  The flooding eventually burst through a nearby road, releasing a

surge of water into the downstream valley which damaged the
plaintiff's property.  The insurance policy in question covered
losses from "explosion" (the cause claimed by the insured) but
excluded coverage for water damage (the cause claimed by the
insurance company) under an exclusion identical to the "water"
exclusion in the Harleysville policy here.  <u>Id.</u> at 752.  The
"lead-in" provision to the exclusion provided:

> We will not pay for loss or damage caused
> directly or indirectly by any of the
> following.  Such loss or damage is excluded
> regardless of any other cause or event that
> contributes concurrently or in any sequence
> to the loss.

<u>Id.</u>  This language is identical to the "anti-concurrent
causation" lead-in in the policy at issue here.

The New Hampshire Supreme Court had no difficulty upholding
the entry of summary judgment for the insurance company and
expressly enforcing the anti-concurrent causation clause.  <u>Bates</u>,
943 A.2d at 753-54.  The court assumed, without deciding, that
the road's collapse near the culvert was an "explosion," a
covered event, but went on to find that "the rain-induced flood
or overflow of Warren Brook either directly or indirectly caused
damage to the plaintiff's properties . . . .  Thus, the water
exclusion would apply to preclude coverage." <u>Id.</u> at 753
(brackets omitted).  The court's reference to water "directly or

31

indirectly" causing the loss demonstrated that it had permitted the parties to "contract around" the efficient proximate cause doctrine with an anti-concurrent causation clause.  The court's willingness to assume, without deciding, that the culvert and road failure was an "explosion" only reinforces the point; whether any contributing cause was the efficient proximate cause was of no consequence, because the lead-in clause excluded both direct and indirect causes.

The Club acknowledged <u>Bates</u> in its summary judgment memorandum, but dismissed it as "legally distinguishable because in <u>Bates</u> plaintiff did not contest, nor did the Supreme Court analyze, the 'lead in' clause."  The court disagrees on both counts.  Although the opinion did not expressly acknowledge it, the parties' appellate briefs reveal that the insured raised, and the insurer joined, the issue of the clause's possible unenforceability.  The insurer's brief notes that the trial court expressly relied on the "anti-concurrent clause," and went on to argue--incorrectly, as it turned out--that the clause was inapplicable.  (Brief on Behalf of the Plaintiff-Appellant at 15, <u>Bates v. Phenix Mutual Fire Ins. Co.</u>, No. 2007-0177 (N.H. Supr. Ct. 2008)).  In its brief, the insurer made an even lengthier argument on this point.  (Brief of the Appellee at 13-14, <u>Bates v. Phenix Mutual Fire Ins. Co.</u>, No. 2007-0177 (N.H. Supr. Ct.

2008))).  These arguments were reactions to the superior court's detailed analysis of the anti-concurrent causation clause, which concluded "that New Hampshire would favor the majority rule permitting parties to freely contract out of the efficient proximate cause doctrine."  (Order on Cross-Motions for Summary Judgment, <u>Bates v. Phenix Mutual Fire Ins. Co.</u>, slip op. at 10-12, No. 06-E-0046 (N.H. Sup. Ct., Feb. 7, 2007)).

The court also rejects the Club's argument that the New Hampshire Supreme Court did not analyze the clause.  It quoted the entire anti-concurrent causation provision in the main text of its opinion, <u>Bates</u>, 943 A.2d at 752, and later quoted the clause again, making specific reference to the words "directly or indirectly" and "regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  <u>Id.</u> at 753.  In the same paragraph, the court noted its assumption without deciding that an "explosion" was a contributing cause to the loss, and its finding that water "directly or indirectly caused damage to the plaintiff's properties."  <u>Id.</u> (brackets omitted).  If these passages -- applying contract language to facts, and doing so against the backdrop of an applicable

33

doctrine of law –– do not constitute "analysis," this court is at a loss to describe what does.[16]

It is true that the <u>Bates</u> court's analysis does not expressly address the clause's enforceability as a matter of public policy.  This is not troubling, however, in light of the court's longtime recognition that consistency with public policy is a prerequisite to the enforceability of any provision of an insurance policy.  <u>See</u>, <u>e.g.</u> <u>Charest v. Union Mut. Ins. Co.</u>, 113 N.H. 683, 686 (1973).  Moreover, the superior court expressly ruled that the clause was enforceable, and the superior court did

_____

[16]  Counsel for the Club –– who should be credited with citing the <u>Bates</u> decision at all, as Harleysville did not –– also argues that <u>Bates</u> is distinguishable because the <u>Bates</u> plaintiff was viewed as "apparently conceding" that water was at least an indirect cause of the loss in that case, whereas the Club makes no such concession regarding the causal effect of the groundwater pressure here.  <u>See</u> 943 A.2d at 753.  This argument overestimates the importance of "concession" as a distinguishing factor.  The <u>Bates</u> court made a finding that water was at least an indirect cause of the loss; whether that finding was based on a concession or on some other evidence is of no consequence to the enforceability of the anti-concurrent causation clause.  Further, the <u>Bates</u> plaintiff's concession does not appear to have been an express, unequivocal concession, but rather an "apparent" one, <u>Bates</u>, 943 A.2d at 753, much like the Club's concession in this case, for purposes of summary judgment, that although the groundwater was not the efficient proximate cause of the loss, it was at least an indirect, concurrent cause in the sense of tort (as opposed to contract) causation.  Finally, whether or not the Club is willing to make the concession that groundwater pressure contributed to the loss, its expert physical engineer agrees with Harleysville's expert:  the groundwater pressure, in combination with the draining of the pool, caused the pool to float and, thus, the ensuing loss.  <u>See</u> <u>supra</u> Part III(B)(1)and n.9.

not so much as question, let alone overrule, that ruling on
appeal.

Other available data strongly suggests that, even if this
court had not expressly enforced an anti-concurrent causation
clause four months ago in Bates, there is little doubt that it
would enforce the clause at issue here.  "In the absence of a
definitive ruling by the highest state court," this court has
previously recognized that it "may consider analogous decisions,
considered dicta, scholarly works, and any other reliable data
tending convincingly to how the highest court in the state would
decide the issue at hand."  United Mutual, 835 F. Supp. at 63-64
(quoting Redgrave v. Boston Symphony Orchestra, Inc., 855 F.2d
888, 903 (1st Cir. 1988) (en banc)).

First, the New Hampshire rule has long been that "[a]bsent
statutory provision or public policy to the contrary, an
insurance company is free to limit its liability through an
exclusion written in clear and unambiguous language."  Miller,
156 N.H. 117, 120 (2007); Charest, 113 N.H. at 686.  New
Hampshire has not enacted legislation limiting the rights of
parties to insurance contracts to contractually limit coverage as
it has, for example, in the context of automobile liability
insurance.  See Wegner v. Prudential Prop. & Cas. Ins. Co., 148
N.H. 107, 109 (2002).  Almost a decade ago, our sister district

of Massachusetts noted that the "vast majority of states" enforce such clauses, and scholarly authorities confirm that this is still the case.  <u>Preferred Mutual Ins. Co. v. Meggison</u>, 53 F.Supp.2d 139, 142 (D. Mass. 1999); 4 Leitner, § 52:9; <u>see</u> M. Wuerfel at 407; 7 Couch, § 101:45.  Given this legacy, the <u>Bates</u> court's enforcement of the anti-concurrent causation clause was a predictable application of its time honored approach to insurance coverage, deferring where appropriate to "the intent of the contracting parties."  <u>Tech-Built 153</u>, 153 N.H. at 373.  The court rules that under New Hampshire law, the anti-concurrent cause provision is enforceable.

**IV.   <u>CONCLUSION</u>**

For the reasons set for above, the court finds that coverage for the loss in question is excluded by the "water" exclusion or the "earth movement" exclusion of the Harleysville policy, if not both; that groundwater pressure, though not the efficient proximate cause of the loss, was at least an indirect cause of the loss bringing it under the policy's "anti-concurrent cause" exclusion, and that the policy's "anti-concurrent causation" clause is enforceable under New Hampshire law.  Accordingly, the Club's motion for summary judgment is DENIED, Harleysville's motion for summary judgment is GRANTED, all other motions are

DENIED AS MOOT.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


Dated:  June 24, 2008

cc:  Timothy G. Kerrigan, Esq.
     Andrew J. Piela, Esq.
     Lawrence A. Dugan, Esq.
     Ralph Suozzo, Esq.